UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UFCW LOCAL ONE PENSION FUND; and
its TRUSTEES,

      Plaintiffs,

v.                   6:11-CV-1144
                   (GTS/ATB)
15 MCFADDEN ROAD, INC.; and
ENIVEL PROPERTIES, LLC,

      Defendants.
_____

APPEARANCES:           OF COUNSEL:

SLEVIN & HART, P.C.         ELIZABETH A. HARLAN, ESQ.
 Counsel for Plaintiffs
1625 Massachusetts Avenue, N.W. Suite 450
Washington, D.C. 20036

GETNICK, LIVINGSTON, ATKINSON    PATRICK G. RADEL, ESQ.
& PRIORE, LLP
 Co-Counsel for Plaintiffs
258 Genesee Street, Suite 401
Utica, New York 13502

CULLEY, MARKS, TANENBAUM     GLENN E. PEZZULO, ESQ.
& PEZZULO, LLP
 Counsel for Defendants
36 West Main Street, Suite 500
Rochester, New York 14614

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

   Currently before the Court, in this ERISA action filed by UFCW Local One Pension Fund ("the Fund") and its Trustees ("Plaintiffs") against 15 McFadden Road, Inc., and Enivel Properties, LLC ("Defendants"), are Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment. (Dkt. No. 16; Dkt. No. 19.) For the reasons set forth

below, Plaintiffs' motion is granted in part and denied in part, and Defendants' cross-motion is denied, such that (1) Plaintiffs' claim against 115 McFadden Road, Inc., is dismissed from this action, but (2) Plaintiffs' claim against Enivel Properties, LLC, survives Defendants' cross-motion for summary judgment.

I.     **RELEVANT BACKGROUND**

    A.     **Plaintiffs' Claims**

Generally, liberally construed, Plaintiffs' Complaint alleges as follows. (Dkt. No. 1.) On or about Novemeber 17, 2007, Empire Beef Co., Inc. ("Empire"), a New York corporation and employer, withdrew from the Fund. (*Id*.) As a result of its withdrawal, Empire incurred a withdrawal liability assessment to the Fund in the amount of $1,235,644.00, under ERISA. (*Id*.) Because they are other trades or businesses under common control with Empire, Enivel Properties, LLC ("Enivel"), and 15 McFadden Road, Inc., are jointly and severally liable for this withdrawal liability assessment. (*Id*.) As a result, Plaintiffs seek a judgment against those two entities, awarding Plaintiffs the withdrawal liability assessment, as well as interest, liquidated damages, and fees and costs incurred by the Fund to collect that assessment. (*Id*.) Familiarity with the factual allegations supporting this claim in Plaintiffs' Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id*.)

    B.     **Undisputed Material Facts**

Generally, unless followed by record citations, the below factual assertions are undisputed by the parties, based on a comparison of their Rule 7.1 Statements and Responses. (Dkt. No. 16, Attach. 1 [Plfs.' Rule 7.1 Statement]; Dkt. No. 19, Attach. 5 [Defs.' Rule 7.1 Response and Additional Material Facts]; Dkt. No. 20, Attach. 1 [Plfs.' Response to Defs.' Additional Material Facts].)

The Fund is a joint labor-management pension fund, which provides retirement and related benefits to the eligible employees of employers who contribute to the Fund pursuant to various collective bargaining agreements with the United Food and Commercial Workers District Union Local One. Until the date of its withdrawal from the Fund in 2007, Empire contributed to the Fund on behalf of its employees covered by a Collective Bargaining Agreement.

On or about November 17, 2007, Empire effected a "complete withdrawal" from the Fund pursuant to ERISA Section 4203(a), 29 U.S.C. § 1383(a). As a result, Empire incurred a withdrawal liability assessment in the amount of $1,235,644.00.

On January 24, 2008, the Fund sent Empire a Notice and Demand for payment of the withdrawal liability assessment. The Notice and Demand stated that "the withdrawal liability is owed by Empire Beef Company and all trades or businesses under common control." However, Empire did not make the first installment payment due on April 1, 2008. On April 24, 2008, the Fund notified Empire that, if payment was not received within 60 days from the date of the letter, Empire would be in default as defined by Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A). Nonetheless, Empire failed to make any payment. On July 24, 2008, the Fund notified Empire that it was in default.

Neither Empire nor Enivel initiated arbitration of the withdrawal liability assessment within the time period specified in Section 4221(a)(1) of ERISA, 29 U.S.C. § 1401(a)(1) or at any point thereafter. The Fund filed suit against Empire on February 6, 2009. On September 13, 2011, the Court entered judgment against Empire in the amount of $1,790,343.90, which included the withdrawal liability assessment, interest, liquidated damages, attorneys' fees, and costs. Empire has failed to pay any amounts to the Fund.

Enivel is a limited liability company that was formed in 2003 for the *sole* purpose of serving as a holding company for Steven H. Levine and Lori Levine's real estate investments. (Dkt. No. 16, Attach. 6, at 29 [Tr. of Dep. of Lori Levine, stating, "[The purpose of Enivel] was solely to have a holding company for these real estate investments"].) Lori Levine has stated that her objective, of course, was to buy properties at one price and later sell them at a higher price so as to realize a profit. She has explained that the process was "speculative," involving her picking a piece of property that she thought had value, "hold[ing] onto it," and then, "if someone came along to buy it," selling it. (Dkt. No. 16, Attach. 6, at 30 [Tr. of Dep. of Lori Levine].) From 2004 through 2012, Enivel has owned six properties, some of which have been leased to tenants or farmers.

In particular, while the record is somewhat unclear as to the precise dates on which the properties were acquired and first leased to tenants or farmers, it appears that Enivel has owned the following six properties: (1) a residential condominium unit located on East Avenue in Rochester, New York, which it started leasing to tenants on a short-term basis in May of 2007 (in order to offset ongoing carrying costs such as insurance, real estate taxes, and maintenance);[1] (2) a 42.0-acre parcel of unimproved land located at 128 Ogden Center Road in Ogden, New York, which it acquired at some point before November of 2007, and started leasing to a farmer in or before May of 2008 (in order to offset ongoing carrying costs such as insurance and real estate taxes);[2] (3) a 5.2-acre parcel of unimproved land located at 392 Mildahn Road in

---

[1] (Dkt. No. 16, Attach. 6, at 103 [Tax Form]; Dkt. No. 19, Attach. 1, at ¶¶ 5, 9 [Affid. of Lori Levine]; Dkt. No. 16, Attach. 6, at 30-31 [Depo. of Lori Levine].)

[2] (Dkt. No. 19, Attach. 1, at ¶¶ 5, 8 [Affid. of Lori Levine]; Dkt. No. 16, Attach. 6, at 31 [Depo. of Lori Levine].)

Walworth, New York, which it acquired at some point before November of 2007, and has not leased to tenants or farmers;[3] (4) a condominium in Florida, which it acquired in approximately 2009, and started leasing to tenants in approximately 2010;[4] (5) a house on West Henrietta Road near Rochester, New York, which it acquired in approximately 2008, and subsequently started leasing to tenants;[5] and (6) a 2.0-acre parcel at 1382 Scottsville Road in Rochester, New York, which it acquired on April 2, 2008, and sold on November 24, 2010.[6]

Lori Levine actively searched for a buyer for one of the properties (the parcel located on Scottsville Road) because she stated that it was "non-performing asset" and that she "would rather [sell it and] take a loss and be done with it than [. . .] be paying taxes [on it] and not bringing in revenue [so as to offset ongoing carrying costs]." (Dkt. No. 16, Attach. 6, at 30 [Tr. of Dep. of Lori Levine].)

On its federal tax return for 2007, Enivel reported $1,020 in net income from residential real estate, which was attributable to its East Avenue property in Rochester. In addition, Enivel reported gross rental income for 2007 in the amount of $6,055. Finally, Enivel reported rental

---

[3]   (Dkt. No. 19, Attach. 1, at ¶ 5 [Affid. of Lori Levine].)

[4]   (Dkt. No. 19, Attach. 1, at ¶ 5 [Affid. of Lori Levine, testifying that, as of November 17, 2007, Enivel owned only three properties, none of which was the Florida condominium]; *cf.* Dkt. No. 19, Attach. 5, at ¶ 33 [Defs.' Rule 7.1 Response, stating that property was purchased on January 1, 2009, but not citing record in support of that fact]; Dkt. No. 16, Attach. 6, at 31 [Depo. of Lori Levine, agreeing that property was "purchased on or about . . . 1999," but not explaining how Enivel could have acquired it at that time, given that it did not come into existence until 2003].)

[5]   (Dkt. No. 16, Attach. 6, at 31 [Depo. of Lori Levine].)

[6]   (Dkt. No. 19, Attach. 1, at ¶ 3 [Affid. of Lori Levine]; Dkt. No. 19, Attach. 2 [Quit Claim Deed]; Dkt. No. 19, Attach. 3 [Warranty Deed]; *cf.* Dkt. No. 16, Attach. 6, at 32 [Depo. of Lori Levine, testifying that the property was owned from approximately 2004 to approximately 2009].)

real estate expenses of $5,035, which consisted of legal/professional fees, taxes, utilities, depreciation and condo association fees. (Dkt. No. 16, Attach. 1.)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id*.)

### C. Parties' Briefing on Their Motions

Generally, in support of their motion for summary judgment, Plaintiffs argue as follows: (1) Enivel was an "employer" under Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") as of the date of withdrawal, and specifically Enivel was a trade or business under common control with Empire; (2) Enivel received proper notice of the withdrawal liability assessment; (3) Enivel failed to initiate arbitration in the required timely manner and therefore cannot raise any defenses in this action; and (4) as a result, Plaintiffs argue that Enivel owes the Fund liquidated damages, interest, and attorneys' fees and costs. (*See generally* Dkt. No. 16, Attach. 2 [Plfs.' Memo. of Law].)

In addition, in their motion, Plaintiffs request that 15 McFadden Road be dismissed from this action as a Defendant, because that entity was not a trade or business at the time of Empire Beef's withdrawal from the Fund, and therefore is not subject to joint and several liability in this action; and Enivel does not object to that dismissal. (Dkt. No. 16, Attach. 2, at 6, n.1 [attaching page "1" of Plfs.' Memo. of Law]; Dkt. No. 19, Attach. 4, at 5 [attaching page "1" of Defs.' Memo. of Law].) <u>As a result, 15 McFadden Road is dismissed from this action as a defendant</u>.

Generally, in Defendants' response to Plaintiffs' motion for summary judgment, and in support of their cross-motion for summary judgment, they argue that Enivel is not a "trade or

business" under 29 U.S.C. § 1301(b)(1), because (1) Enivel is merely a holding company for the Levines' personal investments, (2) Enivel never intended to earn any profit, (3) Enivel's leasing activities were not continuous or regular, and (4) Enivel never leased property to the withdrawing employer in question (Empire). (*See generally* Dkt. No. 19, Attach. 4 [Defs.' Opp'n Memo. of Law].)[7]

Generally, in their reply, Plaintiffs argue that, because Enivel is a formal business organization conducting continuous activities for profit (not personal investment), Enivel satisfies the test under *Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), for determining the existence of a trade or business. (*See generally* Dkt. No. 20, [Plfs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

---

[7] Enivel concedes that it was under common control with Empire, that it received proper notice of withdrawal liability assessment, and that it failed to initiate arbitration in a timely manner, thereby waiving the right to contest the amount of the withdrawal liability assessment.

### B.     Legal Standards Governing Plaintiffs' Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiffs' claims in this action, the Court will not recite, in detail, all of those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (*See generally* Dkt. No. 16, Attach. 2 [Plfs.' Memo. of Law]; Dkt. No. 19, Attach. 4 [Dfts.' Opp'n Memo. of Law]; Dkt. No. 20 [Plfs.' Opp'n Memo. of Law].) The Court would recite only the following points of law.

In order for a plaintiff to prevail on a motion for summary judgment on an issue of withdrawal liability, that plaintiff must establish no genuine dispute of material fact as to the following three elements: (1) that the defendant constituted an "employer" under the MPPAA prior to the withdrawal; (2) that the defendant received notice of withdrawal liability assessment against it; and (3) that the defendant failed to initiate arbitration as required by the MPPAA. *Bd. of Tr. of Trucking Emp. of N. Jersey Welfare Fund, Inc. v. Canny*, 900 F. Supp. 583, 592 (N.D.N.Y. 1995) (McAvoy, C.J.).

With regard to the first element (i.e., that the defendant constituted an "employer" under the MPPAA as of the date of withdrawal), it is important to note that ERISA was amended by MPPAA, 29 U.S.C. §§ 1381-1453, to provide that trades and businesses under common control shall be treated as a single, unified employer. *See* 29 U.S.C. § 1301(b)(1). As a result, as indicated by the statute, an entity incurs joint and several liability for withdrawal liability owed to a pension fund under the MPPAA simply by (1) being a "trade or business" that is (2) under

common control with the withdrawing employer.[8]

With regard to the second requirement of this single-employer rule, "no economic nexus is required between the obligated organization and trades or businesses under common control because the statute does not impose one." *Cent. States, Se. and Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895, n.1 (7th Cir. 2001).

With regard to the first requirement of this single-employer rule, for an entity to be a trade or business, the entity must engage in the activity (1) for the *primary* purpose of income or profit, and (2) with continuity and regularity. *Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987) ("We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.").

Whether or not a taxpayer is engaged in the activity for profit depends on all the surrounding facts and circumstances of the case. *See Golanty v. Comm'r of Internal Revenue*, 72 T.C. 411, 426 (Tax Ct. 1979), *aff'd*, 647 F.2d 170 (9th Cir. 1981). Greater weight is given to objective facts than to a taxpayer's mere statement of intent. *See Dreicer v. Comm'r of Internal Revenue*, 78 T.C. 642, 645 (Tax Ct. 1982), *aff'd*, 702 F.2d 1205 (D.C. Cir. 1983).

The income tax regulations provide a list of relevant factors to consider in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the

---

[8] *See Corbett v. MacDonald Moving Servs. Inc.*, 124 F.3d 82, 86 (2d Cir. 1997) ("[A]ll businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another."); *Unite Nat'l Ret. Fund v. Veranda Mktg. Co.*, 04-CV-9869, 2009 U.S. Dist. LEXIS 59447, at *11 (S.D.N.Y. July 9, 2009) ("[W]hen withdrawal liability is imposed on an employer, all other commonly-controlled trades or business are liable as well.").

taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *See* 26 C.F.R. § 1.183-2(b).[9] No one factor is conclusive. *See Dunn* v. *Comm'r of Internal Revenue*, 70 T.C. 715, 720 (Tax Ct. 1978), *aff'd on other grounds*, 615 F.2d 578 (2d Cir. 1980).

Generally, the most relevant time period, for purposes of making this trade-or-business determination, is the period *before* the employer withdraws from the pension fund. *See*, *e.g.*, *McDougall v. Pioneer Ranch L.P.*, 494 F.3d 571, 578 (7th Cir. 2007) (analyzing the business activity of the partnership from 1994, the year it was established, through 2003, the year of the employer's withdrawal); *Fulkerson*, 238 F.3d at 896 (stating that Tom Fulkerson purchased three properties between 1985 and 1987, and later sold two of them in 1990 and 1995, respectively, before making a complete withdrawal in 1998); *Cent. States, Se. and Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 795 (7th Cir. 1992) (analyzing activity over a span of four years, including two years prior to withdrawal, and one year after for tax return purposes).

This makes sense, given the fact that relying on the period *after* an employer withdraws from a pension fund to determine whether another entity (which was under common control with the employer) was a trade or business would not appear to accomplish the "main purpose" of the single-employer rule, which is "to prevent a business subject to an unfulfilled pension debt from

---

[9] *See* 29 U.S.C. § 1301(b)(1) (stating that the regulations prescribed under the single-employer rule set forth in § 1301(b)(1) shall be "consistent and co-extensive with regulations prescribed for similar purposes by the Secretary of the Treasury under [Section 414(c) of the Internal Revenue Code of 1986]").

'fractionalizing its operations' or shifting assets to [already] related companies to avoid meeting its financial obligations to the plan." *Cent. States Se. and Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993).[10] Indeed, it would appear nonsensical to focus on a later time period because the other requirement of the single-employer rule–the existence of a controlled group–"is determined as of the date of the employer's withdrawal from the pension fund." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 881 (7th Cir. 2011); *Nysa-Ila Pension Trust Fund by & Through Capo v. Montague Assocs.*, 94-CV-3604, 1996 U.S. Dist. LEXIS 12278, at *5 (S.D.N.Y. Aug. 21, 1996). Similarly, Empire itself had to be considered an "employer" prior to the withdrawal. *See Canny*, 900 F. Supp. at 592 ("In order to sustain its claim for purposes of summary judgment, plaintiff must establish...(1) that defendants constituted an 'employer' under MPPAA *prior* to the withdrawal . . . .") (emphasis added).

## III. ANALYSIS

After carefully considering the matter, the Court finds that, based on the current record, a genuine dispute of material fact exists with regard to whether Enivel is a "trade or business" under 29 U.S.C. § 1301(b)(1). In making this finding, the Court relies on the reasons stated in both Plaintiff's memoranda of law and Defendants' opposition memorandum of law. (*See, supra,* Part I.C. of this Decision and Order.) To those reasons the Court would add only two brief points.

---

[10] The Court notes that it appears that even operations that have been fractionalized must have been trades or businesses *before* the fractionalization. *See Connors v. Incoal, Inc.*, 995 F.2d 245, 251, n.8 (D. D.C. 1993) ("The . . . decision to interpret section 1301(b)(1) only by relying on statutory purpose poses problems of its own. Ultimately, the purpose of section 1301(b)(1)–to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities, . . .–does not take a court very far, because the court must still decide if a particular 'operation' qualifies as a 'trade or business.'") (internal citation and quotation marks omitted); *cf.* S. Rep. No. 383, 93d Cong., 2d Sess. 43, *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4890, 4928 ("The committee . . . intends to make it clear that the coverage and antidiscrimination provisions [of ERISA] cannot be avoided by operating through separate corporations instead of separate branches of one corporation.").

First, based on the current record, it is unclear if the *primary* purpose of Enivel was for income/profit. As indicated above, regardless of whether Enivel may have transformed into a "trade or business" after November of 2007, the more relevant inquiry is whether Enivel was a "trade or business" as of (i.e., during the time leading up to) the time of Empire's withdrawal from the Fund, on or about November 17, 2007. *See, supra,* Part I.B. of this Decision and Order.

Based on the current record, it appears that only one of the three properties owed by Enivel in November of 2007 (its East Avenue property) was leased to tenants or farmers before November of 2007. *See, supra,* Part I.B. of this Decision and Order.[11] Moreover, the point of the rent from this one lease (before November of 2007) appears to have been to offset ongoing carrying costs (until a sale could occur), not to generate a net profit (over and above those carrying costs). *Id*. For example, Lori Levine testified to that fact in her affidavit and deposition. *Id*. Indeed, while Enivel received $6,055 in gross income from residential real estate in 2007 (attributable to its East Avenue property in Rochester), it received only $1,020 in net income, because it incurred rental real estate expenses of $5,035 (consisting of legal/professional fees, taxes, utilities, depreciation and condo association fees). *Id*.

Furthermore, while this fact is by no means determinative, it is at least relevant that the stated principal business activity of Enivel was "Investments"; the stated principal product or service of Enivel was "Investments"; the NAICS business code for Enivel was 523900 (investments); and the intended purpose of Enivel was to hold long-term investments. (*Compare* Dkt. No. 19, Attach. 5 [asserting fact and supporting assertion with admissible record evidence]

---

[11] While Enivel's leasing of its property in Ogden, New York, started in or before May of 2008, it does not appear, based on the current record, that the leasing of the property started before November of 2007. *See, supra,* Part I.B. of this Decision and Order. Similarly, while it is unclear whether the acquisition of the condominium in Florida was before or after November of 2007, it does not appear, based on the current record, that the leasing of the condominium started before November of 2007. *Id*.

*with* Dkt. No. 20, Attach. 1 [admitting fact]; *cf*. Dkt. No. 16, Attach. 6, at 29 [Tr. of Dep. of Lori Levine, stating, "[The purpose of Enivel] was solely to have a holding company for these real estate investments"].)

Second, based on the current record, even if the primary purpose Enivel was for income/profit, it is unclear if Enivel engaged in that activity with continuity and regularity. For example, it is unclear how much time Steven and/or Lori Levine spent, on a weekly basis, finding the properties, purchasing the properties, listing the properties for sale, and trying to find lessees of the properties, between May 27, 2003 and November 17, 2007.

For all of these reasons, the portion of Plaintiffs' motion for summary judgment regarding Enivel, and the entirety of Defendants' cross-motion for summary judgment, are denied; Plaintiffs' claim against Enivel shall proceed to trial (unless the parties are able to settle their dispute before then).

**ACCORDINGLY,** it is

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 16) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendants' cross-motion for summary judgment (Dkt. No. 19) is **DENIED**; and it is further

**ORDERED** that 115 McFadden Road, Inc., is **DISMISSED** as a Defendant from this action; and it is further

**ORDERED** that Plaintiffs' claim against Enivel Properties, LLC, survives Defendants' cross-motion for summary judgment; and it is further

**ORDERED** that counsel are directed to appear on **SEPTEMBER 30, 2013** at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **AUGUST 30, 2013**, and the parties are directed to engage in meaningful settlement negotiations prior to the 9/30/13 conference. In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: August 14, 2013
      Syracuse, New York

_____
Hon. Glenn T. Suddaby
U.S. District Judge