UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UFCW LOCAL ONE PENSION FUND; and
its TRUSTEES,

                    Plaintiffs,

v.                                                  6:11-CV-1144
                                                  (GTS/ATB)
ENIVEL PROPERTIES, LLC,

                    Defendant.
_____

APPEARANCES:                                           OF COUNSEL:

SLEVIN & HART, P.C.                            JEFFREY S. SWYERS, ESQ.
  Counsel for Plaintiffs                            PAUL E. KNUPP, ESQ.
1625 Massachusetts Avenue, N.W. Suite 450
Washington, D.C. 20036

CULLEY, MARKS, TANENBAUM           GLENN E. PEZZULO, ESQ.
& PEZZULO, LLP
  Counsel for Defendant
36 West Main Street, Suite 500
Rochester, New York 14614

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

       On April 7, 2014, the Court conducted a bench trial in the above-captioned action filed by the UFCW Local One Pension Fund and its Trustees ("Plaintiffs") against Enivel Properties, LLC ("Defendant") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). At the end of the trial, the Court reserved decision, permitted the filing of post-trial briefs by June 5, 2014. After carefully considering the matter, the Court finds in favor of Defendant on Plaintiff's claim, and directs the Clerk of the Court to enter judgment for Defendant. The following constitutes the Court's findings of fact and conclusions of law in support of its verdict.

I. **RELEVANT BACKGROUND**

   A. **Plaintiffs' Complaint**

Generally, liberally construed, Plaintiffs' Complaint alleges as follows. (Dkt. No. 1.) On or about November 17, 2007, Empire Beef Co., Inc. ("Empire"), a New York corporation and employer, withdrew from the United Food and Commercial Workers Local One Pension Fund (the "Fund"). (*Id*.) As a result of its withdrawal, Empire incurred a withdrawal liability assessment to the Fund in the amount of $1,235,644.00, under ERISA. (*Id*.) Because Enivel Properties, LLC ("Enivel") is another trade or business under common control with Empire, Enivel is jointly and severally liable for this withdrawal liability assessment. (*Id*.) As a result, Plaintiffs seek a judgment against Enivel, awarding Plaintiffs the withdrawal liability assessment, as well as interest, liquidated damages, and fees and costs incurred by the Fund to collect that assessment. (*Id*.) Familiarity with the factual allegations supporting this claim in Plaintiffs' Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id*.)

   B. **Issue for Trial**

In their pre-trial stipulations of fact, pre-trial briefs, and post-trial briefs, the parties identify the main, if not sole, legal issue at trial as whether Enivel was a "trade or business" under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453 (Dkt. No. 40, at 8 [Pre-Trial Stips. of Fact]; Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 41 [Plfs.' Pre-Trial Brief]; Dkt. No. 54 [Plfs.' Post-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].)

### C. Facts Established at Trial

Before trial, the parties jointly submitted pretrial stipulations of fact. (Dkt. No. 40 [Pre-Trial Stips. of Fact].) At trial, the testimony of Lori A. Levine was adduced. (Dkt. No. 52 [Tr. Trans.].) In addition, the following 17 exhibits were admitted into evidence: (1) Enivel's Operating Agreement, effective May 27, 2003; (2) Enivel's Articles of Organization, filed May 27, 2003; (3) Enivel's Employer Identification Number, issued June 9, 2003; (4) Enivel's income tax returns for 2007; (5) a letter from the Fund to Steven Levine dated January 24, 2008, regarding Empire's withdrawal liability assessment; (6) a letter from Bonadio & Co., LLP to Enivel dated April 5, 2008; (7) a letter from the Fund to Steven Levine dated April 24, 2008, regarding Empire's withdrawal liability assessment; (8) a letter from the Fund to Steven Levine dated July 24, 2008, regarding Empire's withdrawal liability assessment; (9) a Consent Judgment and Order dated September 13, 2011, regarding Empire; (10) a Collective Bargaining Agreement between Empire and United Food and Commercial Workers International Union, effective January 19, 2006; (11) the Fund's Withdrawal Liability Rules, dated March 2005, with subsequent amendments; (12) the Fund's Policy for Collection of Delinquent Contributions, dated December 10, 2002; (13) an excerpt from the New York State Commercial Association of Realtors website, regarding Lori Levine ; (14) another excerpt from the New York State Commercial Association of Realtors website, regarding Lori Levine ; (15) an excerpt from Showcase.com, regarding five of Lori Levine's real property listings; (16) another excerpt from Showcase.com, regarding Lori Levine's Mildahn Road property listing; and (17) another excerpt from Showcase.com, regarding Lori Levine's Ogden Center Road property listing. (Tr. Exs. P-1, P-2, P-3, P-4, P-5, P-6, P-7, P-8, P-10, P-11, P-12, P-13, P-17, P-18, P-19, P-20, P-21, and D-1.)

Generally, based on this evidence, the following facts have been established.

### 1. Empire Beef Co., Inc.

The Fund is a joint labor-management pension fund, which provides retirement and related benefits to the eligible employees of employers who contribute to the Fund pursuant to various collective bargaining agreements with the United Food and Commercial Workers District Union Local One. Until the date of its withdrawal from the Fund in 2007, Empire contributed to the Fund on behalf of its employees covered by a Collective Bargaining Agreement.

On or about November 17, 2007, Empire effected a "complete withdrawal" from the Fund pursuant to ERISA Section 4203(a), 29 U.S.C. § 1383(a). As a result, Empire incurred a withdrawal liability assessment in the amount of $1,235,644.00. As of the date of withdrawal, Steven Levine owned 100% of the stock of Empire Beef.

By letter dated January 24, 2008, the Fund sent Empire a Notice and Demand for payment of the withdrawal liability assessment. The Notice and Demand stated that "the withdrawal liability is owed by Empire Beef Company and all trades or businesses under common control." However, Empire did not make the first installment payment due on April 1, 2008. By letter dated April 24, 2008, the Fund notified Empire that, if payment was not received within 60 days from the date of the letter, Empire would be in default as defined by Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A). Nonetheless, Empire failed to make any payment. By letter dated July 24, 2008, the Fund notified Empire that it was in default.

Neither Empire nor Enivel initiated arbitration of the withdrawal liability assessment within the time period specified in Section 4221(a)(1) of ERISA, 29 U.S.C. § 1401(a)(1) or at any point thereafter. The Fund filed suit against Empire on February 6, 2009. On September 13, 2011, the Court entered judgment against Empire in the amount of $1,790,343.90, which

included the withdrawal liability assessment, interest, liquidated damages, attorneys' fees, and costs. Empire has failed to pay any amounts to the Fund.

### 2. Enivel Properties, LLC

Enivel is a limited liability company that was formed on May 27, 2003. At the time of formation (and continuing until 2008), Steven Levine held 40% of the stock of Enivel, and Lori Levine held 60% of the stock of Enivel. In 2007 or 2008, Steven Levine gifted his shares to his and Lori Levine's children (following his divorce from Ms. Levine). (Dkt. No. 52, at 5, 12, 14-16, 32 [Tr. Trans.].)

The purpose of Enivel was to serve as a holding company for Steven and Lori Levine's real estate investments. (Dkt. No. 40, at ¶¶ 11-12 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 11, 14, 16-17, 21, 42 [Tr. Trans.].) More specifically, Enivel's purpose was to buy properties at one price and later sell them at a higher price, in order to realize a profit. (Dkt. No. 40, at ¶ 12 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 11 [Tr. Trans.]; *cf.* Tr. Ex. P-1.) The reason Enivel was formed as a limited liability company was to protect the Levines from legal liability in case somebody was injured on one of their properties. (Dkt. No. 52, at 16-17, 21 [Tr. Trans.].)

Enivel's Manager, Lori Levine, has been responsible for its business operations. Apart from performing work for Enivel, Ms. Levine has performed work for Enivel Commercial Realty, a separate entity. (Dkt. No. 52, at 4-5, 9-10 [Tr. Trans.].) Ms. Levine was (and is) a licensed real estate broker.

### 3. Enivel's Pre-Withdrawal Properties

From May 27, 2003, through November 17, 2007, Enivel owned the following three properties: (1) a residential condominium unit located on East Avenue in Rochester, New York (the "East Avenue Condo"); (2) a 5.2-acre parcel of unimproved land located at 392 Mildahn

5

Road in Walworth, New York (the "Mildahn Road Property"); and (3) a 42.0-acre parcel of unimproved land located at 128 Ogden Center Road in Ogden, New York (the "Ogden Center Road Property").

### a. East Avenue Condo

Enivel purchased the East Avenue Condo in May 2007, and sold the condominium at a loss in 2010 when the local market started deteriorating. Originally, the condominium was intended to serve was a residence for the Levines' daughter for personal reasons; however, when it was learned that the Levines' daughter would not be residing in the condominium, Enivel held onto the condominium as an investment, and started leasing the condominium periodically to offset the carrying costs (which included condominium association fees, real property taxes, and insurance premiums). (Dkt. No. 52, at 31-32, 39 [Tr. Trans.]; Dkt. No. 40, at ¶ 15 [Pre-Trial Stips. of Fact].) Generally, during that three-year period, Enivel leased the condominium to three or four residential tenants who generally responded by telephone to advertisements posted by Lori Levine on Craigslist. (Dkt. No. 52, at 31-35 [Tr. Trans.].) One such tenant was obtained through a referral by a prior tenant. (*Id*. at 37.) Ms. Levine would typically talk to an applicant on the telephone, show him or her the condominium, have them fill out a standard application form purchased from Staples, call his or her employer to confirm his or her employment, and then have him or her sign a standard lease purchased from Staples; she would not perform a credit check. (*Id*. at 32, 34-36.) Ms. Levine determined the amount of rent to charge based on the amounts charged by other landlords for condominiums in the building. (*Id*. at 36.) Tenancies consisted of sporadic month-to-month leases with Enivel, and the property was unoccupied approximately 20% of the time during the three-year period. Enivel held an insurance policy covering the condominium and retained contractors to perform periodic maintenance and upkeep of the property.

### b. Mildahn Road Property

Enivel purchased the Mildahn Road Property in 2004, and thereafter listed it for sale through a third-party real estate broker. More specifically, Enivel's efforts to sell the Mildahn Road Property have consisted of (1) erecting a sign on the property and telling people about it, (2) listing the property with a brokerage firms, who also erected signs on the property, (3) listing the property with LoopNet.com, (4) listing the property on the Enivel Commercial Realty website "later on," and (5) only recently making "cold calls" to developers soliciting the sale of the property. (Dkt. No. 52, at 41-42 [Tr. Trans.]; Tr. Exs. P-19, P-20.) The property has not been leased. (Dkt. No. 52, at 43 [Tr. Trans.].)

### c. Ogden Center Road Property

Enivel purchased the Ogden Center Road Property in 2004. Enivel holds an insurance policy on the property. At some point, Enivel started leasing the property to a farmer in order to preserve the erosion of the land, and to offset the tax burden. (Dkt. No. 52, at 52-53 [Tr. Trans.].) Eventually, Enivel listed the property on "LoopNet under Enivel Commercial Reality." (*Id*. at 45.)

### 4. Enivel's Post-Withdrawal Properties

After November 17, 2007, Enivel owned the following three additional properties: (4) a 2.0-acre parcel at 1382 Scottsville Road in Rochester, New York (the "Scottsville Road Property"); (5) a house on West Henrietta Road near Rochester, New York (the "West Henrietta Road Property"); and (6) a condominium in Florida (the "Florida Condo"). (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 29, 46, 53 [Tr. Trans.].)

### a. Scottsville Road Property

Enivel purchased the Scottsville Road Property in 2008 and sold it at a loss in 2010. (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 53 [Tr. Trans.].) Lori Levine actively searched for a buyer for the Scottsville Road Property because it was a "non-performing asset," meaning that it was incurring real property taxes in excess of its appreciation in value or its revenue. (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact].)

### b. West Henrietta Road Property

Enivel purchased the West Henrietta Road Property in 2008, and has since leased it sporadically to residential tenants. (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact].)

### c. Florida Condo

At some point after 2008, Enivel purchased the Florida Condo, which had been purchased for Lori Levine's father long before 2003. (Dkt. No. 52-55 [Tr. Trans.].) At some point in time, the Florida Condo was subsequently sold. (*Id*. at 54-55.)

### 5. Enivel Tax Information

Enivel's 2007 New York State Tax Return (which was prepared by a professional accounting firm retained by Enivel) states that the "principal business activity" of Enivel was "Investments." (Dkt. No. 40, at ¶ 12 [Pre-Trial Stips. of Fact]; Tr. Exs. P-4, D-1.)

In 2007, Enivel reported gross rental income in the amount of $6,055 (from its East Avenue Condo). (Tr. Exs. P-4, D-1.) Enivel reported and claimed a deduction for rental real estate expenses of $5,035, which consisted of legal and professional fees, real property taxes, utilities, depreciation and condominium association fees. (Dkt. No. 40, at ¶ 19 [Pre-Trial Stips. of Fact].) As a result, Enivel reported $1,020 in net income from residential real estate (which

was attributable to its East Avenue Condo). (Tr. Exs. P-4, D-1.) Enivel also reported and claimed a deduction for real property taxes in the amount of $3,295. (Dkt. No. 40, at ¶ 19 [Pre-Trial Stips. of Fact].) As a result, Enivel reported a net loss in the amount of $2,275.00. (*Id.*)

## II. GOVERNING LEGAL STANDARD

ERISA was amended by the MPPAA to provide that trades and businesses under common control shall be treated as a single, unified employer. *See* 29 U.S.C. § 1301(b)(1). As a result, as indicated by the statute, an entity incurs joint and several liability for withdrawal liability owed to a pension fund under the MPPAA simply by (1) being a "trade or business" that is (2) under common control with the withdrawing employer. *See Corbett v. MacDonald Moving Servs. Inc.*, 124 F.3d 82, 86 (2d Cir. 1997) ("[A]ll businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another."); *Unite Nat'l Ret. Fund v. Veranda Mktg. Co.*, 04-CV-9869, 2009 U.S. Dist. LEXIS 59447, at *11 (S.D.N.Y. July 9, 2009) ("[W]hen withdrawal liability is imposed on an employer, all other commonly-controlled trades or business are liable as well.").

To satisfy the first requirement of this single-employer rule (i.e., that the entity is a "trade or business"), the entity must engage in the activity (1) for the primary purpose of income or profit, and (2) with continuity and regularity. *Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987) ("We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.").[1]

---

[1] With regard to the second requirement of this single-employer rule (i.e., that the entity is under common control with the withdrawing employer), the Court notes that, in their briefs, the parties have conceded that the second requirement has been satisfied in this case. The Court would add only that, with regard to the second requirement, "no economic nexus is

9

## A. Primary-Purpose-of-Income-or-Profit Determination

In making the primary-purpose-of-income-or-profit determination, courts consider the facts and circumstances that distinguish between operating for income or profit and operating for "personal" reasons. *Groetzinger v. Comm'r Internal Revenue*, 771 F.2d 269, 274 (7th Cir. 1985), *aff'd*, 480 U.S. 23 (1987). Such personal reasons include leasing real property to a tenant for the primary purpose of something other than the generation of income or profit. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 643 (7th Cir. 2001) (holding that the renting of apartments above a residential garage was not a "trade or business," even when the owner realized income, where the owner's primary purpose for renting the apartments was the added security from the tenant's presence). Such personal reasons also include holding onto real property as an "investment," where the owner spends a "negligible" amount of time managing any leases. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 878-79 (7th Cir. 2011) ("The[] criteria [set forth in *Groetzinger*] are intended to distinguish a trade or business from investments, hobbies, or amusement diversions. . . . [P]ersonal investments are things like holding shares of stock or bonds in publicly traded corporations. . . . Owning property can be considered a personal investment, at least where the owner spends a negligible amount of time managing the leases . . . .") (internal quotation marks and citations omitted). For example, spending no more than five hours per year managing leases has been held to be such a negligible amount of time. *See Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 893 (7th Cir. 2001) ("Tom has not devoted more than five

---

required between the obligated organization and trades or businesses under common control because the statute does not impose one." *Cent. States, Se. and Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895, n.1 (7th Cir. 2001).

10

hours in any year in connection with the properties, and claims that he purchased the properties for investment purposes. According to Tom, he does little more than deposit the rent checks and make mortgage payments, and reports the rental income on Schedule E of his federal income tax forms for supplemental income. . . .").

**B.     Continuity-and-Regularity Determination**

In making the continuity-and-regularity determination in cases involving real property, courts consider "activities taken with regard to the property" beyond "mere ownership." *Fulkerson*, 238 F.3d at 895-96. Such activities include "negotiating leases, researching properties, maintaining or repairing properties, etc." *Id*. at 895. Moreover, "[w]hen a corporation is the landlord, it is appropriate to consider all the actions taken on behalf of the landlord to fulfill the landlord's duties under the lease . . . ." *Cent. States, Se. & Sw. Areas Pension Fund v. Hughes*, 09-CV-7201, 2012 U.S. Dist. LEXIS 60118, at *20 (N.D. Ill. Apr. 30, 2012). Depending on the lease, such actions may include the following: (1) "receiving rent checks," "depositing the rent checks and making mortgage payments"; (2) "furnishing information to tax preparers"; (3) "handl[ing] the tenant's requests"; (4) performing "routine repairs and cleaning" on the property, as well as "mowing the grass" and performing "other lawn care activities"; and (5) locating and contacting "contractors or plumbers to do heavier maintenance" and "review[ing] the work once it was completed." *Hughes*, 2012 U.S. Dist. LEXIS 60118, at *14-15, 21-23. As for the frequency of the activity, "[a]n activity is operated with regularity if it is operated constantly, continually, steadily, sustainedly, and if it is operated in a methodical way." *Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, LLC*, 421 F. Supp.2d 71, 76 (D. D.C. 2006) (internal quotation marks omitted).

C.      **Relevant Time Period**

Generally, the most relevant time period for purposes of making this trade-or-business determination is the period *before* the employer withdraws from the pension fund. *See*, *e.g.*, *McDougall v. Pioneer Ranch L.P.*, 494 F.3d 571, 578 (7th Cir. 2007) (analyzing the business activity of the partnership from 1994, the year it was established, through 2003, the year of the employer's withdrawal); *Fulkerson*, 238 F.3d at 896 (stating that Tom Fulkerson purchased three properties between 1985 and 1987, and later sold two of them in 1990 and 1995, respectively, before making a complete withdrawal in 1998); *Cent. States, Se. and Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 795 (7th Cir. 1992) (analyzing activity over a span of four years, including two years prior to withdrawal, and one year after for tax return purposes).

This statutory interpretation makes sense, because relying on the period *after* an employer withdraws from a pension fund to determine whether another entity (which was under common control with the employer) was a trade or business would not appear to accomplish the "main purpose" of the single-employer rule, which is "to prevent a business subject to an unfulfilled pension debt from 'fractionalizing its operations' or shifting assets to [already] related companies to avoid meeting its financial obligations to the plan." *Cent. States Se. and Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993).[2]  Indeed, it would appear

---

[2]     The Court notes that it appears that even operations that have been fractionalized must have been trades or businesses *before* the fractionalization.  *See Connors v. Incoal, Inc.*, 995 F.2d 245, 251, n.8 (D. D.C. 1993) ("The . . . decision to interpret section 1301(b)(1) only by relying on statutory purpose poses problems of its own. Ultimately, the purpose of section 1301(b)(1)–to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities, . . .–does not take a court very far, because the court must still decide if a particular 'operation' qualifies as a 'trade or business.'") (internal citation and quotation marks omitted); *cf.* S. Rep. No. 383, 93d Cong., 2d Sess. 43, *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4890, 4928 ("The committee . . . intends to make it clear that the coverage and antidiscrimination provisions [of ERISA] cannot be avoided by operating through separate corporations instead of separate branches of one corporation.").

nonsensical to focus on a later time period because the other requirement of the single-employer rule–the existence of a controlled group–"is determined as of the date of the employer's withdrawal from the pension fund." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 881 (7th Cir. 2011); *Nysa-Ila Pension Trust Fund by & Through Capo v. Montague Assocs.*, 94-CV-3604, 1996 U.S. Dist. LEXIS 12278, at *5 (S.D.N.Y. Aug. 21, 1996). Similarly, Empire itself had to be considered an "employer" prior to the withdrawal. *See Canny*, 900 F. Supp. at 592 ("In order to sustain its claim for purposes of summary judgment, plaintiff must establish . . . (1) that defendants constituted an 'employer' under MPPAA *prior* to the withdrawal . . . .") (emphasis added).

## III. ANALYSIS

### A. Whether the Primary Purpose of Enivel Was for Income or Profit

After carefully considering the matter, the Court answers this question in the negative for the reasons offered by Defendant in its pre-trial and post-trial briefs. (Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].) The Court would add only four points.

First, the purpose of the East Avenue Condo was originally personal–to serve as a residence for the Levines' daughter for personal health reasons. (No testimony regarding any rent payments by the Levines' daughter was adduced at trial.) When the Levines learned that their daughter would not be residing in the apartment (due to personal health reasons), they decided to hold onto the condominium as an investment. It was only then that Enivel starting leasing the condominium to other tenants in order to offset the carrying costs of the investment.

For the sake of brevity, the Court will set aside the fact that the leasing of the condominium was not designed to generate, nor was it successful in generating, a net income or profit to Enivel. The Court will similarly set aside the fact that Enivel sold the condominium at a

loss. More important is the fact that insufficient evidence was adduced at trial regarding the number of hours Lori Levine spent per year managing the leasing of the condominium. (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also, infra,* Part III.B. of this Decision and Order.

Rather, the evidence at trial revealed the following facts regarding Ms. Levine's management of the leasing of the condominium. The "search" for tenants consisted of postings on Craigslist. The "background" check of an applicant consisted of a brief telephone call to his or her employer. The "negotiation" of leases consisted of use of a standard lease purchased from Staples, at a rental rate rather casually adopted from the rates for other condominiums in the building. During the occupation of the condominium, maintenance was merely "periodic"–a frequency further diminished by the fact that the condominium was unoccupied approximately 20% of the time. Based on these facts, the Court finds that it would be speculative to conclude that Ms. Levine spent any more than a few hours year managing the leasing of the condominium. Stated another way, Plaintiffs did not persuade the Court, based on the evidence adduced at trial (and reasonable inferences therefrom), that Ms. Levine spent any more than a few hours per year managing the leasing of the condominium.

Second, the purpose of the Mildahn Road Property appears to have been as a personal investment, since the date of its purchase in 2004. No evidence was adduced at trial that this property was leased. It is true that Ms. Levine's efforts to sell the Mildahn Road Property have included (1) informing people of its existence, (2) listing the property with various real estate brokers who erected signs on the property, (3) listing the property with LoopNet.com, and (4) listing the property on the Enivel Commercial Realty website at some subsequent point in time. However, insufficient evidence was adduced at trial regarding the number of hours Ms. Levine spent per year engaging in these activities. (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also,*

*infra,* Part III.B. of this Decision and Order. Again, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year trying to sell the Mildahn Road Property.

Third, the purpose of the Ogden Center Road Property appears to have been as a personal investment, since the date of its purchase in 2004. It is true that, at some point, Enivel started leasing the property to a farmer to offset ongoing carrying costs such as insurance. It is also true that Ms. Levine listed the property on LoopNet.com. However, insufficient evidence was adduced at trial regarding the *extent* of Ms. Levine's efforts to do such things as obtain a tenant and negotiate a lease. (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also, infra,* Part III.B. of this Decision and Order. Again, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year managing the leasing of this 42.0-acre parcel of unimproved land and attempting to sell it.

Fourth, because the most relevant time period for purposes of making this trade-or-business determination is generally the period before the employer withdraws from the pension fund (*see, supra,* Part II.C. of this Decision and Order), the Court need not linger on the properties purchased by Enivel after November 17, 2007. The Court will merely point out that (1) no evidence was adduced at trial that the Scottsville Road property was ever leased, (2) no evidence was adduced at trial regarding how many hours Ms. Levine spent "sporadically" leasing the West Henrietta Road Property, and (3) the evidence at trial established that the purpose of the Florida Condo was originally to serve as a residence for Ms. Levine's father, and that the condominium was subsequently sold. Again, based on the evidence adduced at trial, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year trying to lease, managing, and/or trying to sell these three properties.

For all of these reasons, the Court finds that, while the secondary purpose of Enivel was for income or profit, the *primary* purpose of Enivel was personal.

15

### B. Whether Enivel Engaged in Activity for Income or Profit with Continuity and Regularity

After carefully considering the matter, the Court answers this question in the negative for the reasons offered by Defendant in its pre-trial and post-trial briefs. (Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].) The Court would add only five points.

First, because the Court has already concluded that the primary purpose of Enivel was not income or profit, the Court need to decide this issue (i.e., whether Enivel engaged in income or profit activity with continuity and regularity), and it does so only as an alternative ground for its decision.

Second, as indicated above in Part III.A. of this Decision and Order, it is unclear from the evidence adduced at trial how much time Ms. Levine spent per year (1) negotiating the leases to the East Avenue Condo and the Ogden Center Road Property (or the West Henrietta Road Property and Florida Condo), (2) researching properties for Enivel to purchase, and (3) maintaining or repairing the properties in question.

Third, as for any further obligations imposed on Enivel by the East Avenue Condo and Ogden Center Road Property leases (or the West Henrietta Road Property and Florida Condo leases), it is unclear what those obligations were due to a failure to adduce copies of the relevant leases, or adduce trial testimony sufficiently describing the terms of those leases.

Fourth, even if the Court were to speculate that Enivel possessed a broad range of duties under the relevant leases, insufficient trial evidence was adduced regarding the continuity and regularity with which Enivel did such things as receive rent checks, deposit rent checks, make mortgage payments, furnish information to tax preparers, handle tenant requests, perform routine repairs and cleaning on the properties, moved the grass, performed other lawn care activities,

16

located and contacted contractors, and reviewed their work at the East Avenue Condo and Ogden Center Road Property (or the West Henrietta Road Property and Florida Condo). Rather, the Court is left merely with discrete and vague pieces of testimony regarding property management such as "I told people about [the Mildahn Road property] and that's it . . . I didn't give it much more thought than that," and "I'm sure along the line I had hired somebody outside help [sic] to probably fix or paint something." (Dkt. No. 52, at 42, 38 [Tr. Trans.].) Based on the evidence adduced, the Court is unable to draw the reasonable inferences necessary to render a finding that any income or profit activities engaged in by Enivel were continuous and regular.

Fifth, the Court notes that, in arguing that it *has* shown how much time Ms. Levine spent working for Enivel, Plaintiffs reason as follows: (1) the only way for Ms. Levine to have obtained a real estate broker's license sometime in 2009 was if, before that time, she had either (a) worked full time for two years "as a licensed real estate salesperson," or (b) worked full time for three years in the "general real estate field"; (2) Ms. Levine could not have availed herself of the first form of experience, because she did not become a licensed realtor until sometime in 2008; (3) as a result, she must have availed herself of the second form of experience; (4) indeed, in her application for a real estate broker's license, she relied on her work for Enivel in 2007 to pursue that second form of experience; (4) the New York Department of State Division of Licensing Services must have found that Ms. Levine had worked full time for Enivel in 2007, because it issued her a real estate broker's license at some point in 2009. (Dkt. No. 54, at 8-9 [attaching pages "4" and "5" of Plfs.' Post-Trial Brief].)

For sake of brevity, the Court will assume that the real estate broker's license requirements are as Plaintiffs represent them to be, and not, in the alternative, some sort of

17

*combination* of the two types and durations of work experience stated.  In addition, the Court will not linger on the fact that Plaintiffs, through their argument, seek to either estop Enivel, or deem Ms. Levine to have made an admission, through a determination (which is assumed to have been correct) rendered by a *third party* (i.e., the New York Department of State Division of Licensing Services).

More important, fairly construed, Ms. Levine's brief and temporally-uncertain trial testimony on the subject indicates that she relied only *in part* on her work for Enivel in 2007 when she completed her real estate broker's license.  (*See, e.g.*, Dkt. No. 52, at 5-9 [Tr. Trans].)  She was not asked, and thus did not testify, whether she performed work in the general real estate field *other than for Enivel* in 2007.  (*See generally* Dkt. No. 52 [Tr. Trans.].)  Finally, she was not asked, and thus did not testify, regarding the number of hours she worked for Enivel in 2004, 2005 and 2006.  (*Id.*) Those years are particularly important in the present enquiry, given that Enivel purchased both the Mildahn Road Property and Ogden Center Road Property in 2004.

For all of these reasons, the Court finds, in the alternative, that any income or profit activities engaged in by Enivel were not continuous and regular, but were interrupted and/or sporadic.

**ACCORDINGLY**, it is

**ORDERED** that judgment be entered in favor of Defendant and the case be closed.

Dated: June 16, 2014
      Syracuse, New York

_____
Hon. Glenn T. Suddaby
U.S. District Judge